UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 3:19-cv-

| | |
|---|---|
| JENNIFER ESTES | ) |
| | ) |
|      Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| OFFICER DALE EASON, OFFICER MATTHEW | ) |
| KIRCHNER, CITY OF PITTSFIELD, | ) |
| SGT. GARY P. HERLAND, OFFICER JENNIFER | ) |
| BRUECKMANN, OFFICER SEAN KLINK, AND | ) |
| OFFICER JOHN DOES 1 AND CHIEF MICHAEL | ) |
| WYNN | ) |
| | ) |
|      Defendants | ) |

## PLAINTIFFS' COMPLAINT AND REQUEST FOR JURY TRIAL

### INTRODUCTION

1.    This is an action in civil rights and tort to recover for injuries Pittsfield police officers inflicted on the plaintiff Jennifer L. Estes ("Estes") by subjecting her to excessive and unnecessary force in violation of his Fourth Amendment rights when she was initially arrested at a supermarket on February 23, 2016 as she was choked and punched in the stomach by a male officer who filed a false report.  She also alleges that after arrested and booked but after the booking video was turned-off she was roughed up by male officers and that her breasts and underwear exposed in front of a male officer and her rights to privacy were violated.  In addition she brings claims for conspiracy to hide the unlawful conduct and municipal and supervisory liability claims arising from the failures to provide appropriate supervision, or discipline of police officers, for tolerance of officers' use of excessive force and for reporting uses of force falsely or not at all.

### JURISDICTION

2.    Plaintiff brings this action pursuant to Massachusetts State Civil Rights Statute, common law of tort, the Massachusetts Declaration of Rights, and under 42 U.S.C. § 1983 for violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and 1343 provide federal question jurisdiction over the federal claims, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

**PARTIES**

3.     Plaintiff Jennifer Estes ("Ms. Estes") is and was at all pertinent times, a resident of Chicopee, Hampden County, Massachusetts.

4.     Defendant City of Pittsfield ("the City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business abode at 70 Allen Street, Pittsfield, Berkshire County, Massachusetts.

5.     Defendant Dale Eason ("Officer Eason") was at all pertinent times a duly appointed and sworn officer of the Pittsfield Police Department ("PPD") residing in 44 Euclid Ave. Pittsfield, Berkshire County, Massachusetts. His actions in this complaint were taken under the color of law.

3.     Defendant Michael Wynn ("Wynn") was at all pertinent times a duly sworn police officer and the Pittsfield Chief of Police and has a usual residential address at 136 Caldwell Rd. Pittsfield, Berkshire County, Massachusetts.

6.     Defendant Jennifer Brueckmann ("Officer Bruekmann") was at all pertinent times a duly appointed and sworn officer of the Pittsfield Police Department ("PPD") residing in 861 Outlook Avenue, Cheshire, Berkshire County, Massachusetts. His actions in this complaint were taken under the color of law.

7.     Defendant Sean Klink ("Officer Klink") was at all pertinent times a duly appointed and sworn officer of the Pittsfield Police Department ("PPD") residing in 31 Bryant Street, Pittsfield, Berkshire County, Massachusetts. His actions in this complaint were taken under the color of law.

8.     Defendant Sgt. Gary Herland ("Officer Herland") was at all pertinent times a duly appointed and sworn officer of the Pittsfield Police Department ("PPD") residing in 333 E. New Lenox Road, Pittsfield, Berkshire County, Massachusetts. His actions in this complaint were taken under the color of law.

9.     Defendant Officer Does was at all pertinent times duly appointed and sworn PPD officer whose identity is unknown at present but who resides in Berkshire County, Massachusetts.

10.    Each individual defendant is sued in his personal capacity for conduct done under color of law in the course of his employment as a sworn police officer of the City.

**FACTS**

11.     Each of the previous paragraphs is incorporated as if fully set forth herein.

12.     At all times pertinent hereto Wynn, as Chief of Police, exercised authority over the PPD and its officers and was a maker of policy as to standards of conduct and discipline within the PPD, and he had the power to discipline, including the power to effectively recommend dismissal of officers, and the power, authority, and duty to hold officers accountable for any use of excessive or unjustified force and for misstatements of fact in official reports.

13.     At all times pertinent hereto the each individual defendant acted under color of law in his capacity as a police officer and/or policy maker of the City and pursuant to the statutes, ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of Pittsfield.

14.     On February 23, 2016 Eason was dispatched to Big Y supermarket in Pittsfield in response to a shoplifting complaint.

15.     When he arrived he observed Estes in the parking lot and learned from store personnel she had become irate.

16.     Defendant Kirchner arrived to assist Eason.

17.     Eason placed her under arrest with handcuffs behind her back for shoplifting and for disturbing the peace.

18.     He escorted her to the back seat of his PPD cruiser.

19.     Kirchner was in close proximity.

20.     Eason made up a story that while in the back of the cruiser, Estes began to trash around and to hurl insults at him.

21.     Store personnel from Big Y wanted to take a picture of Estes so that they could serve a no-trespass order on her and post her picture inside of the store.

22.     Eason told Big Y personnel he could not bring her back to the store for that purpose. Instead he forcibly removed her from the cruiser and placed her on the ground so that she could be photographed on the parking lot.

23.     While in the back of the cruiser Estes was crying but not moving around and trashing.

24.     While being yanked out by Eason her out her feet got caught.

25.     Estes told Eason her foot was caught but he dragged her out anyway losing a shoe in the process. Her toe nail was pulled and bled.

26.     As he did he purposely banged her head on the door frame.

27.     Eason held her and told her to shut the fuck up and look at the camera as he was kneeing from behind and on her side.

28.     When Estes protested and refused to look in the direction, Eason chocked her and repeatedly told her "Shut the fuck up."

29.     Eason also called her a "Thief"

30.     While Estes was on the ground, store personnel took her picture as Easton tried to hold her head still.

31.     To bring her back into the cruiser, he put her in a chokehold, assaulted punching her in her stomach, banging her head with the door frame area and pushed her inside of his cruiser. See **Ex. 1.**

32.     There was no legal justification for the force used by Officer Eason on Ms. Estes and no reasonable officer would have used such force against her.

33.     His actions show deliberate indifference.

34.     Kirchner was in close proximity and failed to stop Estes assault or to intervene. See **Ex. 1.**

35.     Later on Kirchner admitted to investigators Estes complained to him that Eason had assaulted her.

36.     Eason lied in his report that he removed her for her safety.

37.     Later on he changed his story.

38.     Eason then placed her back in the back of the cruiser and transported her to the PPD. He charged her with shoplifting after she allegedly left the store with a carriage full of baby diapers without paying for the items.

39.     Eason brought her back to the PPD.

40.     When she arrived to the PPD the officer in charge was Defendant Sgt. Herland.

41.   Sgt. Herland was in charge of the well-being of prisoners and as officer in charge was also responsible to insure that prisoners would be treated in accordance with acceptable police practices.

42.   Defendants' Brueckmann and Klink assisted with the booking which was videotaped.

43.   Brueckmann is initially visible next to Estes when her booking begins.

44.   Upon information and belief Sgt. Herland videotaped Estes booking and quickly learned she was extremely upset and distraught.

45.   Sgt. Herland asked Estes if he was ill or injured.

46.   Estes replied she was 3-month pregnant.

47.   Estes told Herland she had been punched in the stomach and choked.

48.   Estes told Herland "He opened the door and he chocked me…"

49.   The existing booking tape is approximately 2 minutes and 12 seconds.

50.   After the booking tape was turned officer Brueckmann and two male officer searched her inappropriately.

51.   Brueckmann began stripping her clothing in the same area she had been booked.

52.   Her pants came down and a tank top shirt she was wearing. Her pants were pulled down as well.

53.   Her panties were visible.

54.   Because of it she became hysterical especially because of past experiences.

55.   One of the officers twisted her arm and right wrists but none of this was captured on video because they had turned it off.

56.   Her breast became exposed in the presence of Klink and Doe violating PPD and her privacy rights.

57.   As this was happening the male officers were telling her to shut her mouth up.

58. Sgt. Herland was present and witnessed when this happened and did nothing to stop it nor bother to intervene.

59. She asked to go to the hospital but was told if she did she would miss court.

60. To cover his tracks and protect fellow officers Herland wrote Estes was non compliant during the search of her person by Officer Brueckmann and had to be restraint in a compliant wrist lock by Officer Sean Klink due to her pulling away from Officer Brueckermann.

61. There was no legal justification for the force used on Ms. Estes and no reasonable officers would have used such force against her.

62. Estes notified Sgt. Herland she had been assaulted by Eason, i.e. chocked, and punched in the stomach.

63. As the officer in charge Sgt. Herland had a duty to notify that information to his superiors up the chain of command in accordance with the Massachusetts Injured Prisoner Statute, i.e. Chapter 276 § 33.

64. The law and PPD policies governing injured prisoner reports procedures required it.

65. Without this information the entire chain of command is unable to assess how its officers use force in the field.

66. Instead of reporting exactly what Estes had said about her injuries or notifying his superiors to open an investigation against Eason for a crime and/or at a minimum for the use of unreasonable force, Sgt. Herland sanitized Estes verbal assault complaint.

67. Herland only reported "3 months pregnant, complaining of pain to wrists and stomach handcuff marks on wrist. EMS responded to PPD, Estes declined medical attention." See **<u>Ex. 2</u>**.

68. The injured prisoner report was co-signed by a police Captain but was not co-signed or reviewed by the Chief of Police as required by the Mass. Injured Prisoner Statute.

69. Upon information and belief, the former Chief of Police never saw, reviewed or took action, i.e., Estes' injured prisoner report failed to fully document the physical interactions involving officer Brueckermann, Klink and Doe.

70. Herland's sanitized injured prisoner's report evinces the existence of a code of silence in the PPD.

71.    Herland's sanitized the injured prisoner report so as not to raise any red flags regarding his own misconduct, the unreasonable use of force employed by the other codefendants' and to cover for his own failure to intervene or protect Ms. Estes during her booking.

72.    Sgt. Herland reported that due to Estes' non-compliance during booking Estes remained handcuffed despite her injuries and that she allegedly slapped, punched and kicked the walls and door of female cell number one for hours.

73.    Booking photographs show visible injuries in her chest area, brusing in her stomach, and cuts in above the left wrist area and right hand area as well as swelling.

74.    Other existing photographs of Estes (2 of them) were provided to Estes counsel and were completely redacted.

75.    Estes injuries were  not *de minimis.*

76.    Photographs were taken as she complained of pain and had wrists marks from handcuffs.

**Medical Care**

77.    Estes initially requested that she be taken to the hospital. An EMT's arrived to check on her and after they checked her she declined to go but went to the hospital the next day because she was told by booking staff if she went to the hospital she could not bail out the same day.

78.    The next day she was seen at Berkshire Medical Center the next day and complained of a chest wall pain and bruising, bruising in her wrist, extreme pain.

79.    She incurred $2,484.11 in medical bills as a direct result of treatment for her medical injuries.

**The Investigation:**

80.    Estes criminal defense lawyer obtained a court order to review the video tape of Big Y.

81.    The Big Y video demonstrated that Eason had lied, had been untruthful about his interactions with Estes.

82.    Without his efforts Eason's false report would not have seen the day of light.

83.    On April 13, 2016 the DA's office realized the video surveillance of Big Y appear to conflict with Eason's police and arrest report.

84.    The DA's office notified Chief Wynn, who ordered an investigation.

85.   The investigation revealed a number of critical discrepancies.

86.   Lt. Michael Grady from PPD who was in charge of investigating the discrepancies noted the video surveillance and radio transmissions didn't sound like Ms. Estes was "trashing her body around the back seat" as initially reported by Eason.

87.   Lt. Grady noted: "All I heard was crying and sobbing in the background."

88.   Lt. Grady also concluded that Eason used excessive force to remove Estes from the squad car and that during the attempt at the photograph is done Eason also used an excessive amount of force and while putting Ms. Estes in the back of the cruiser.

**89.**   Eason admitted to investigators from internal affairs of the PPD he removed Estes so she could be photographed by Mr. Augustynowicz from Big Y. **Ex. ___.**

90.   Lt. Grady concluded "Removing Ms. Estes from the cruiser so that Mr. Agustynowicz could get a picture of her is not a legitimate action of a Pittsfield Police Officers.  It's officer Eason's conduct that causes Ms. Estes to become upset when is dragged out onto the ground in front of the public. It would appear that Ms. Estes didn't want the humiliation of being photographed in handcuffs on the ground in the travel lane of the parking lot at the Big Y. Any force used by Officer Eason is excessive because it is conduct that created a situation with Ms. Estes."

91.   Eason was charged with conduct unbecoming of an officer untruthfulness and falsifying records.

92.   During the investigation, Estes – was interviewed by Lt. Grady "During the booking process at the station a female officer searched her inappropriately in front of two males."

93.   Neither him nor Chief Wynn, investigate Estes claim of abuse, of being searched out inappropriately, of being injured or why her booking tape was turned off to avoid documentation of the incident.

94.   This also evinces deliberate indifference and the existence of a code of silence.

95.   As a result of Defendants' conduct as set forth herein, Estes suffered physical injury and great pain of body and mind, and he incurred reasonable expenses for necessary treatment of her injuries.

96.   All criminal charges against Estes were nolle prosequi.

97.   On or about September 2016 Eason was fired from the PPD.[1]

---

[1] Recently he was rehired as a result of a ruling from the Massachusetts Supreme Judicial Court.

**Other examples of unconstitutional practices and awareness of Eason's prior disciplinary record**

98.     At all pertinent times the City and the PPD maintained and observed a *de facto* policy and practice of failing to consistently require documentation and accountability for use of force and injuries occurring in the course of arrests.

99.     In Rose v. City of Pittsfield, et al Case 3:12-cv-30062MGM, Plaintiff alleged he was the subject of unreasonable force during an April 9, 2009 arrest that involved a number of police officers and that the PPD failed to discipline its police officers.  See Dkt. 1 Dated 3/27/2012.

100.    In Barry v. City of Pittsfield, Case 3:12-cv-30182MAP, Dkt. 1, 10/18/2012 Plaintiff alleged he was shot by PPD officer without justification.

101.    The lawsuit also alleged municipal liability and named its Chief  of Police. Upon information and belief, the City settled Mr. Barry's civil rights claim.

102.    A number of Pittsfield Police officers have sued the City in state and federal court alleging employment discrimination, violations to the whistle blower statute, See, Brueckermann v. City of Pittsfield, et al, Case 3:17-cv-30067-MAP, Dkt. 1.

103.    This was not the first time that Eason's job behavior had been called into question.

104.    In 2015 Eason and Brueckmann were sent to a wrong address for a disturbance report in which they arrested an 88-year old woman.

105.    Even after being made aware they were in the wrong location Eason and his partner, Brueckermann placed the woman under arrest, handcuffed her alleging she approached Eason with a knife and threatened him.

106.    Criminal charges against the 88-year old Phyllis Stankiewicz were dismissed and upon information and belief Pittsfield paid close to $225K to settle her claim of being wrongfully arrested and prosecuted.

107.    Upon information and belief emails obtained by The Berkshire Eagle found that Capt. Granger described Eason as one of the "most problematic officers when it comes to the use of force and good judgment."

108.    By way of example and not limitation, another PPD officer, Miles Barber who  recently left the force amid an investigation into whether he improperly stored his gun, the Berkshire Eagle newspaper reported Barber also had faced disciplinary action for multiple incidents extending over a decade.

109. They included running unauthorized background checks, submitting time slips for work he allegedly did not perform, violating numerous rules and regulations of the PPD.

110. As reported by the Berkshire Eagle, one internal investigation against Barber determined he took pictures of a female crime victim in violation of "well established practice" that when sensitive photos need to be taken, they are taken by an officer of the same gender. If one were not immediately available female dispatchers or female nurse…"

111. The Berkshire Eagle found records that suggested: "Officer Barber has over ten years of experience working at the police department and yet still continues (to) behave improperly and also commit actions that (are) and ones that other officers routinely do in a proper and acceptable manner," part of the report authored by now-retired Capt. David R. Granger reads. "The continuous and repeated counseling that his sergeants, his shift commander and I do with him does little to dissuade him."

112. At the time of this incident the City of Pittsfield had a policy or custom of indifference to misconduct by Pittsfield police officers by failing to properly investigate complaints of misconduct and to discipline officers who used unreasonable or excessive force.

113. The City of Pittsfield also had a policy or custom of tolerating a "code of silence" in which its officer understood that they were not to report misconduct by fellow officers.

114. The City of Pittsfield developed a custom and practice of making it difficult for citizens to file complaints about the conduct of its officers.

115. Once complaints of unreasonable force are filed, the Pittsfield police department allowed a custom to develop among its officers of failing to properly investigate these claims and failing to discipline officers who used unreasonable force.

116. The Pittsfield police department also failed to monitor officer's use of force by ensuring that officers filed reports whenever someone taken into custody had a visible injury.

117. These reports are required by law and by the City's police department policies.

118. Pittsfield police officers routinely submit false or incomplete forms that do not report prisoners' injuries or the actual circumstances that led to the use of force.

119. The City condoned this widespread violation of Massachusetts law as well as PPD's own internal policies.

120. Because officers knew that they could get away with not reporting the actual force they used or the injuries they caused or the circumstances in which they occurred, officers felt free to use excessive force that caused injuries.

121.    At the time of this incident, the City of Pittsfield had a policy or custom of indifference to misconduct by police officers by failing to properly investigate complaints of misconduct and to discipline officers who used unreasonable force.

122.    The PPD also developed a custom of not requiring its police officers to be interviewed when complaints were filed against them and of requiring civilians to be interviewed even when the policies that govern internal investigation did not require it.

123.    The PPD also failed to monitor officer's use of force by ensuring that officers filed reports whenever someone taken into custody had a visible injury.

124.    These reports are required by law and by the City's police department policies.

125.    Pittsfield police officers routinely submit false or incomplete forms that do not report prisoners' injuries or the actual circumstances that led to the use of force.

126.    The City condoned this widespread violation of Massachusetts law as well as PPD's own internal policies.

127.    Because officers knew that they could get away with not reporting the actual force they used or the injuries they caused or the circumstances in which they occurred, officers felt free to use excessive force that caused injuries.

128.    The misconduct of the City and its policy makers included but was not limited to the following:

    a)    Systemic failure to ensure that Defendants' and other PPD officers did not fabricate evidence.

    b)    Systemic failure to ensure that Defendants' and other PPD officers prepared truthful reports.

    c)    Systemic failure to ensure that Defendants' and other PPD officers complied with departmental policies and procedures.

    d)    Systemic failure to ensure that Defendants' and other PPD officers used reasonable levels of force upon individuals and civilians their officers came in contact with.

    e)    Systemic failures to ensure that Defendants' and other PPD officers complied with their obligations regarding the processing, inspection, documentation and investigation of injured prisoner reports under M.G.L. c. 276 § 33.

    f)    Systemic failures to ensure Defendants' and other PPD supervisory staff investigate complaints of civilian injuries at the time of booking.

g) Systemic failures to ensure PPD officers and supervisory staff provide prompt medical care to injured prisoners at the time of arrest and/or booking.

h) Systemic failures to ensure that PPD supervisory staff disciplined officers who used unreasonable force.

i) Systemic failures to ensure PPD supervisory staff retrain those officers who use unreasonable force.

j) Systemic failures to ensure PPD supervisory staff videotape the bookings of civilians especially those that claimed to have been injured by police and those who claimed to have been injured by excessive force.

k) Systemic failure to ensure that PPD officers disclosed to prosecutors information that is favorable to criminal defendants.

129.   These policies and customs of the City led Pittsfield police officers, including Defendants' to believe that he could violate citizen constitutional rights by using unreasonable force, making arrests without probable cause, filing false police reports and even testifying falsely in court without sanction by the police department.

130.   These policies and customs were the moving force behind Defendants' violations of Estes' civil rights.

## COUNT I
### 42 U.S.C. § 1983: Use of excessive force and Failure to Intervene
### Eason, Klink, Kirchner, Brueckmann, Sgt. Herland and Doe

131.   Each of the foregoing paragraphs is incorporated by reference.

132.   Defendants' actions deprived Estes of well-established rights including freedom from the use of unreasonable force under the Fourth Amendment.

133.   As a direct and proximate result of the foregoing, Estes suffered the injuries described above.

## COUNT II
### 42 U.S.C. § 1983 Due Process
### Eason, Klink, Brueckermann, Sgt. Herland, Kirchner and Doe 1, The City

134.   Each of the foregoing paragraphs is incorporated by reference.

135.   In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to

a fair trial.

136.  Defendants deliberately suppressed exculpatory evidence, hiding it from Plaintiff, his attorneys, and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

137.  In addition, Defendants' fabricated and solicited evidence that they knew to be false which implicated Plaintiff in the crime and obtained Plaintiff's arrest and partial prosecution using that false evidence.  Defendants failed to correct the fabricated evidence they knew to be false when it was used against Estes in criminal proceedings.

138.  The misconduct described in this count was undertaken pursuant to policy and practices of the City in that constitutional violations committed against the Plaintiff were committed with knowledge or approval of policymaking authority for the City of Pittsfield and the PPD or were actually committed by persons with such final policymaking authority.

139.  As a direct and proximate result of the foregoing, Estes suffered the injuries described above.

## COUNT III
### Federal Malicious Prosecution
### Eason, Kirchner

140.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

141.  In the manner described above, Defendant, acting as investigators, individually, jointly and in conspiracy with one another as well as under color of law accused the Plaintiff of criminal activity and exerted influence to initiate and continue judicial proceedings gainst the Plaintiff without probable cause.

142.  In doing so Defendants caused criminal charges to be brought against plaintiff for which there was no probable cause, and he maliciously and for no lawful purpose assisted, participated in and otherwise caused this plaintiff to be criminally prosecuted.

143.  As a direct and proximate result thereof, plaintiff, lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT IV
### State Malicious Prosecution
### Eason

144. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

145. Defendant caused criminal charges to be brought against plaintiff for which there was no probable cause, and he maliciously and for no lawful purpose assisted, participated in and otherwise caused this plaintiff to be criminally prosecuted.

146. As a direct and proximate result thereof, plaintiff, lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that her liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT V
### Assault and Battery
### Eason, Brueckmann, Klink and Doe 1-4

147. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

148. Defendants committed the tort of assault and battery on Ms. Estes without legal justification, cause, excuse, or privilege.

149. As a direct and proximate result thereof, the plaintiff suffered the injuries as described above.

## COUNT VI
### 42 U.S.C. § 1983: Monell Claims Against City of Pittsfield, and Supervisory claims against Chief Wynn and Sgt. Herland

150. Each of the foregoing paragraphs is incorporated by reference.

151. The policies and customs of the City of Pittsfield as described above were the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

152. The policies and customs of the City, Chief Wynn, Sgt. Herland and their failure to intervene, train, supervise and discipline his/their subordinates was the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

**COUNT VII**
**Eason, Brueckman, Klink, Sgt. Herland, Doe**
**Intentional Infliction Emotional Distress**

153.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

154.    Defendants outrageous actions, coupled with his unreasonable use of force constituted intentional infliction of emotional distress.

155.    Defendants subjected Estes to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

156.    As a direct result of the intentional conduct of the defendants in this count, Estes suffered severe emotional distress and great pain of body and mind.

**COUNT VIII**
**Civil Conspiracy**
**Eason, Kirchner, Sgt. Herland, Brueckmann, Klinch & Doe**

157.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

158.    As a direct and proximate result of Defendants' actions, Estes suffered damages.

159.    These Defendants conspired to hide their unlawful conduct by failing to document or report truthfully on the use of force against Estes among other things.

**COUNT IX**
**Massachusetts Civil Rights Act, M.G.L. c. 112 § 11IM**
**Eason, Sgt. Herland, Brueckermann, Klink & Doe**

160.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

161.    Defendants Eason, Sgt. Herland, Brueckermann, Klink and Doe, deprived the plaintiff of hers rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

162.    As a direct and proximate result thereof, the plaintiff suffered the injuries as described herein.

## COUNT X
## Mass Tort Claims Act City of Pittsfield

163.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

164.   At all times material to this complaint all defendants were within the course of their employment.

165.   On February 21, 2018, Plaintiff's counsel served the Town with a letter of Notice and Presentment under the Massachusetts Tort Claims Act.

166.   The letter appraised the City of his allegations and the injuries he sustained as a result of the conduct of its employees.

167.   Plaintiff satisfied all conditions precedent to file this negligence action under Chapter 258 § 4.

168.   Defendants have not compromised the claim.

169.   As a direct and proximate result of the negligent conduct of the City's employees, plaintiff was harmed as stated herein.


**WHEREFORE**, Plaintiff respectfully requests the following relief:

1.   All compensatory damages in a sum according to proof;

2.   All punitive damages against the Defendants' in a sum according to proof;

3.   Injunctive relief;

4.   Award costs of this action, including reasonable attorney's fees and;

5.   Award such other relief as the Court deems just and proper;

## **JURY DEMAND**

Respectfully submitted,
Plaintiff JENNIFER L. ESTES
By his attorneys,

*/s/ Hector E. Pineiro*

_____
Hector E. Pineiro (BBO# 555315)
Robert A. Scott (BBO# 648740)
Law office of Hector E. Pineiro, P.C.
807 Main Street
Pittsfield, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

DATED: February 17, 2019